**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| BRUCE KING | : | |
| 1212 Central Avenue | : | |
| Lindenwold, NJ 08021 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No.: _____ |
| | : | |
| v. | : | |
| | : | |
| CAMDEN IRON & METAL, INC. | : | |
| d/b/a EMR | : | **JURY TRIAL DEMANDED** |
| 100 Atlantic Avenue | : | |
| Camden, NJ 08104 | : | |
| and | : | |
| EMR ADVANCED RECYCLING, LLC | : | |
| 201 N. Front Street | : | |
| Camden, NJ 08102 | : | |
| and | : | |
| MY AUTO STORE, LLC | : | |
| 1605 Thorne St. | : | |
| Camden, NJ 08104 | : | |
| and | : | |
| EMR (USA HOLDINGS) INC. | : | |
| 201 North Front St. | : | |
| Camden, NJ 08102 | : | |
| | : | |
| Defendants. | : | |
| | : | |

## CIVIL ACTION COMPLAINT

Bruce King (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.      Plaintiff has initiated this action to redress violations by Camden Iron & Metal, Inc. d/b/a EMR, EMR Advanced Recycling, LLC, My Auto Store, LLC, and EMR (USA Holdings), Inc. (*hereinafter* collectively referred to as "Defendants") of Title VII of the Civil Rights Act of 1964 ("Title VII" - 42 U.S.C. §§ 200d *et seq*.), 42 U.S.C. Section 1981, the New Jersey Law

Against Discrimination ("NJLAD" - N.J.S.A. §§ 10:5-1 *et seq.*), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601, *et seq.*), the New Jersey Family Leave Act ("NJ FLA"), and the New Jersey Conscientious Employee Protection Act ("CEPA" - N.J.S.A. 34:19-1 *et seq.*). As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. This Court has supplemental jurisdiction over Plaintiff's state law claims because they arise out of the same circumstances and are based upon a common nucleus of operative fact as his federal claims.

3.     This Court may properly assert personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4.     Pursuant to 28 U.S.C. § 1392(b)(2), venue is properly laid in the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

5.     Plaintiff is proceeding herein after properly exhausting all administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## PARTIES

6.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.     Plaintiff is an adult individual, with an address as set forth in the caption.

8.     Defendant Camden Iron & Metal, Inc. d/b/a EMR operates a scrap yard and metal recycling company in different locations, including New Jersey. Defendant Camden Iron & Metal, Inc. operates out of the above-captioned address.

9.     Defendant EMR Advanced Recycling, LLC operates a scrap yard and metal recycling company in different locations, including New Jersey. Defendant EMR Advanced Recycling, LLC has headquarters located at the above-captioned address.

10.     Defendant My Auto Store, LLC is one of the largest auto recyclers and used auto part stores on the East Coast with a location at the above-captioned address.

11.     Upon information and belief, Defendant EMR (USA Holdings), Inc. owns and operates Defendant Camden Iron & Metal, Inc., Defendant EMR Advanced Recycling, LLC, and Defendant My Auto Store, LLC.

12.     Because of their interrelation of operations, common ownership of management, centralized control of labor relations, human resources and training, common ownership/governance or financial controls, and other factors, Defendants are sufficiently interrelated and integrated in their activities, labor relations, ownership, and management that they may be treated as a single and/or joint employer.

13.     At all times relevant herein, Defendants acted through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## **FACTUAL BACKGROUND**

14.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

15.    Plaintiff is a black (African-American) male.

16.    In or about October of 2019, Defendants hired Plaintiff as a Dismantler, 3rd Class position.

17.    During his tenure with Defendants, Plaintiff was a dedicated and hard-working employee who performed his job well.

18.    However, in or about March of 2020, Plaintiff was laid off due to the pandemic.

19.    Due to Plaintiff's aforesaid stellar work performance, in or about October of 2020, Defendants rehired Plaintiff into the Dismantler, 3rd Class position.

20.    Subsequently, in or about summer of 2021, as further evidence of Plaintiff's excellent job performance, Defendants promoted Plaintiff to Supervisor of the Salvage Yard.

21.    Due to Plaintiff's continuing success in his roles with Defendants, Defendants promoted Plaintiff for a third time, in or about late March/early April of 2022, to the Production Supervisor position, a steppingstone in order to train and prepare Plaintiff for the Separation Production Supervisor position on night shift (6:00 p.m. to 6:00 a.m.).

22.    When discussing the Separation Production Supervisor position with Plaintiff, General Manager - Todd Valentine (*hereinafter* referred to as "Valentine"), advised Plaintiff that he needed someone to fill the vacant position, but that said individual was solely responsible for assisting the Maintenance Supervisor, Jose "Mario" Rodriguez (*hereinafter* referred to as "Rodriguez" – Hispanic).

4

23.     Nevertheless, Plaintiff's purported training in his newly assumed role as a Production Supervisor in preparation for the Separation Production Supervisor (discussed *supra*) was an ostensible fabrication.

24.     By way of elaboration, Operations Supervisor - Joe Frazier (*hereinafter* referred to as "Frazier"), a Caucasian individual, was tasked with training Plaintiff in the Production Supervisor position; however, at no time did Frazier properly instruct Plaintiff on how to perform the Separation Production Supervisor job duties.

25.      Even after Plaintiff requested to specifically perform Separation Production Supervisor work to get hands-on training, Frazier dismissed him and stated, "don't worry about it."

26.     By way of further elaboration, within the first week of Plaintiff's purported aforesaid training, Frazier instructed Plaintiff to work with Kelvin (last name unknown – *hereinafter* referred to as "Kelvin" – Hispanic). In response thereto, Kelvin told Plaintiff "I'm not training you, tell Joe to train you."

27.     It was well-known throughout Defendants that Plaintiff was being promoted to the Separation Production Supervisor position for the night shift following his brief period of employment in the Production Supervisor position.

28.     Accordingly, Defendants' night shift employees (predominately Hispanic)[1] began creating a hostile work environment and threatening Plaintiff by making comments over the radios such as "when the nigger gets here we're going to get on out of here." Nothing was done to correct these discriminatory comments and they continued.

---

[1] At the time of his separation from Defendants, Defendants' employees (at Plaintiff's work location) primarily consisted of Hispanic individuals.

29.     After the alleged training period in the Production Supervisor position (discussed *supra*), in or about June of 2022, Defendants promoted Plaintiff to the Separation Production Supervisor position for the night shift (6:00 p.m. to 6:00 a.m.).

30.     After being transferred to the Separation Production Supervisor position for night shift, Plaintiff quickly noticed that he was sole black supervisor on the night shift.

## Racial Discrimination and Hostile Work Environment

31.     Immediately upon Plaintiff's promotion to Separation Production Supervisor for the night shift, in or about June of 2022, Plaintiff realized that this shift was run like a gang wherein Hispanic management employees, such as Rodriguez and Felix (last name unknown – *hereinafter* referred to as "Felix" – Hispanic), would:

      a.     Instruct other Hispanic employees not to communicate with Plaintiff;

      b.     Direct other Hispanic employees not to listen to Plaintiff but rather listen to them instead;

      c.     Ensure no Hispanic employees cooperated with Plaintiff;

      d.     Prevent Plaintiff from communicating with Hispanic employees;

      e.     Make racial epithets towards him, such as calling him a "nigger," "morreno," and "negro;" and

      f.     Speak about Plaintiff in Spanish in a derogatory manner because of his race.

32.     By way of further example, when a machine broke down, Plaintiff would regularly request a mechanic's help to fix it by way of radio, yet the night shift employees (who were primarily Hispanic) refused to assist Plaintiff.

33.     In fact, some of the Hispanic night shift employees would lie to Plaintiff, alleging they did not speak English (even though they did) in order to avoid assisting Plaintiff.

34.     As some night shift employees were not fluent in English, General Laborer – Wilfredo Cuevas (*hereinafter* referred to as "Cuevas" – Hispanic), offered to translate for Plaintiff, as he is bilingual (English and Spanish).

35.     After Rodriguez learned Cuevas was translating for Plaintiff, Rodriguez approached Cuevas and asked, "why're you selling us out?" and "why're you helping that nigger?" Rodriguez also referred to Cuevas as a "snitch" for translating for Plaintiff.

36.     As further evidence of the aforesaid hostile work environment that Plaintiff was subjected to on account of his race, Rodriguez point blank informed Cuevas that he did not like "black people."

37.     Further, Defendants' employees had placed gang symbols and graffiti on the machinery as well as racial slurs such as "nigger" and "the black."

38.     On or about August 27, 2022, Plaintiff met with his Supervisor, Roy Perez (*hereinafter* referred to as "Perez") and reported the aforesaid instances of racial animosity and hostility.

39.     Upon information and belief, Plaintiff's aforesaid complaints of racial discrimination were never properly investigated or resolved and instead, Plaintiff was subjected to retaliation as a result of the same.

40.     Part of the aforesaid retaliation came in the form of Rodriguez attempting to sabotage Plaintiff's employment by regularly informing Valentine that Plaintiff did not report to work.

41.     As an example, on or about September 21, 2022, Valentine text messaged Plaintiff to inquire as to Plaintiff's current whereabouts (insinuating that he was not at work).

42. Plaintiff assured Valentine that he was at work and complained that Rodriguez was giving Valentine false information as to his whereabouts; however, in response, Valentine threatened Plaintiff to "Choose [his] words wisely and how [he] conduct[s] it."

43. Plaintiff talked with Valentine regarding Rodriguez's and Felix's conduct (discussed *supra*) on several occassions. Notably, Valentine was well aware of the foregoing, as Valentine would bring the same to Plaintiff's attention.

44. However, the discriminatory and hostile work environment based on Plaintiff's race and complaints of racial discrimination continued throughout Plaintiff's employment until the date of his unlawful termination (discussed further *infra*).

**<u>Defendants' Unsafe Working Conditions</u>**

45. Throughout his tenure as Separation Production Supervisor, Plaintiff observed several instances of unsafe working conditions, including, but not limited to employees operating heavy machinery for which they were not certified.

46. On one (1) occasion, Plaintiff observed an uncertified forklift employee lift a generator with a forklift on uneven ground and subsequently drop said generator, causing a major crash.

47. Thereafter, in or about August 2022, while in his capacity on the night shift, Plaintiff made a report of unsafe working conditions to Defendants' Management.

48. Plaintiff was subjected to retaliatory measures by Defendants' management following his complaints regarding unsafe working conditions (discussed *infra*).

**Plaintiff's Continued Complaints and Retaliation Thereof**

49.     On or about October 6, 2022, shortly after engaging in protected activity, Defendants removed Plaintiff from the night shift and placed him back on the day shift with Frazier, under the guise of "performance issues."

50.     On said date, Valentine provided Plaintiff with a memorandum titled "Additional Training and Instructions for 3S," alleging the same was to "correct deficiencies and misunderstandings." Curiously, Defendants failed to provide Plaintiff with the opportunity to sign the memorandum or dispute any of the alleged deficiencies despite the fact that Valentine signed the same.

51.     Further, Defendants backdated the memorandum to October 3, 2023, despite presenting it to Plaintiff on October 6, 2023, giving him only until October 21, 2023 to correct the alleged "deficiencies and misunderstandings."

52.     As evidence of blatant retaliation, the Additional Training and Instructions for 3S memorandum was outrageously different from the job description that Defendants' Human Resources initially provided to Plaintiff upon his promotion to the Separation Production Supervisor position.

53.     After Defendants presented Plaintiff with the above-referenced memorandum, in or about October 2022, Plaintiff found a homemade shank on Defendants' property and showed the same to Frazier. Frazier discarded said shank in a vat and said to Plaintiff "don't worry about it."

54.     Subsequently, in or about mid-October 2022, Valentine sent a group text message with an orangutan swinging out of the jungle with the caption "it's time." Plaintiff understood the same to mean that Valentine was referring to Plaintiff as a monkey and that it was time to force Plaintiff out of his employment with Defendants.

55.     On or about October 25, 2022, Felix threatened Plaintiff with bodily harm by approaching him with a wrench stating, "if you're going to be a supervisor, you need to know how to run the plant."

56.     Plaintiff instructed Felix to put down the wrench if not being utilized for his job duties and to get back to work.

57.     Immediately thereafter, Plaintiff reported Felix's threats to Frazier and the Shop Steward, Emil (last name unknown – *hereinafter* referred to as "Emil").

58.     Emil advised Plaintiff to simply write up Felix for the above-mentioned threat of bodily harm (discussed *supra*), while Frazier assured Plaintiff that Defendants would conduct an investigation into the same.

59.     The following day, on or about October 26, 2023, Plaintiff followed up with Emil as to Felix's status, assuming Felix would be placed on a suspension for threatening him. However, Emil had no update for Plaintiff other than to allege that an investigation was ongoing.

60.     On or about October 27, 2023, Plaintiff reported to Human Resources, Charles Atkins' office (*hereinafter* referred to as "Atkins") and escalated his complaint surrounding Felix's threat of bodily harm (discussed *supra*).

61.     In reporting Felix to Atkins, Plaintiff further disclosed the above-referenced race discrimination, retaliation, and unsafe working conditions to Atkins.

62.     In response thereto, Atkins assured Plaintiff that Defendants would conduct an investigation into his aforesaid complaints, and would look into transferring Plaintiff.

**Plaintiff's Request for Medical Leave**

63.     On or about November 1, 2022, Plaintiff text messaged Perez to inquire about a medical leave of absence to care for his father who was on life support and required emergency hip replacement surgery.

64.     In response to Plaintiff's inquiry regarding medical leave, Perez advised that an employee from Defendants' Human Resources office, Nadine (last name unknown – *hereinafter* referred to as "Nadine"), could assist Plaintiff with "FMLA."

65.     In or about the week of November 1, 2022, Plaintiff contacted Nadine in order to request the aforesaid medical leave of absence to care for his father's serious health condition.

66.     On said date, Nadine provided Plaintiff with the requisite medical leave paperwork to apply for FMLA leave.

67.     However, Plaintiff was terminated (discussed *infra*) in advance of returning such paperwork back to the Defendants.

**Plaintiff's Termination**

68.     On or about November 11, 2022, after continued follow up with Atkins regarding the status of his aforementioned complaints of racial discrimination, retaliation, and unsafe working conditions, Atkins, Nadine, and Rachel (last name unknown – *hereinafter* referred to as "Rachel") summoned Plaintiff to a conference room at Defendants' downtown Camden, New Jersey location.

69.     Atkins, Nadine, and Rachel interrogated Plaintiff asking questions such as "are you sure about this?"—in reference to Plaintiff's aforesaid complaints to Human Resources (discussed *supra*).

11

70.     Plaintiff, with tears in his eyes, assured Atkins, Nadine, and Rachel that he was telling the truth and facing race discrimination and retaliation on a daily basis.

71.     Despite consistently complaining and re-enforcing his aforesaid complaints of racial discrimination, retaliation, and unsafe working conditions, Plaintiff's concerns were never properly investigated or remedied and instead, on or about November 11, 2022, Defendants abruptly terminated Plaintiff's employment, allegedly for performance issues.

72.     Defendants' reason for Plaintiff's termination is completely pretextual because: (1) Plaintiff had a history of excellent job performance as evidenced by his numerous promotions within Defendants; (2) Plaintiff received written discipline regarding his performance only after his first complaints of race discrimination and unsafe working conditions; (3) Defendants ostensibly changed Plaintiff's job duties when issuing him the Additional Training and Instructions for 3S memorandum, solely giving him a few weeks to learn the same; (4) Defendants failed to meaningfully address or investigate Plaintiff's numerous aforesaid protected complaints (discussed *supra*); (5) Defendants' Human Resources became hostile with Plaintiff when interrogating him on November 11, 2022 regarding such complaints and seemingly tried to have him change his account of certain things; and (6) Defendants terminated Plaintiff on the same day following his last complaints of racial discrimination, retaliation, and unsafe working conditions and only eleven (11) days after requesting a medical leave to care for his father.

73.     Plaintiff believes and therefore avers that Defendants terminated his employment in violation of Title VII, Section 1981, the NJLAD, the FMLA, the NJ FLA, and the CEPA.

**COUNT I**
**Violation of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**([1] Race Discrimination; [2] Retaliation; and [3] Hostile Work Environment)**
**-Against All Defendants -**

74.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

75.     During Plaintiff's employment with Defendants, he was subjected to a hostile work environment and discrimination through disparate/derogatory treatment and discriminatory comments as outlined *supra* because of his race.

76.     Plaintiff objected to/complained of the aforementioned instances of race discrimination; however, his concerns were ignored, and instead, Plaintiff was subjected to ongoing retaliation – such that he was subjected to a retaliatory hostile work environment.

77.     On or about November 11, 2022, Plaintiff was abruptly terminated from his employment on the same day as his last complaints of racial discrimination/retaliation.

78.     Plaintiff believes and therefore avers that his race was a motivating and/or determinative factor in Defendants' decision to move him to first shift, issue him discipline, and terminate his employment.

79.     Plaintiff also believes and therefore avers that he was terminated in retaliation for complaining of racial discrimination and retaliation.

80.     These actions as aforesaid constitute violations of Title VII.

**COUNT II**
**Violation of 42 U.S.C. Section 1981**
**([1] Race Discrimination; [2] Retaliation; and [3] Hostile Work Environment)**
**-Against All Defendants -**

81.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

82.     During Plaintiff's employment with Defendants, he was subjected to a hostile work environment and discrimination through disparate/derogatory treatment and discriminatory comments as outlined *supra* because of his race.

83.     Plaintiff objected to/complained of the aforementioned instances of race discrimination; however, his concerns were ignored, and instead, Plaintiff was subjected to ongoing retaliation – such that he was subjected to a retaliatory hostile work environment.

84.     On or about November 11, 2022, Plaintiff was abruptly terminated from his employment on the same day as his last complaints of racial discrimination/retaliation.

85.     Plaintiff believes and therefore avers that his race was the but for reason in Defendants' decision to move him to first shift, issue him discipline, and terminate his employment.

86.     Plaintiff also believes and therefore avers that he was terminated in retaliation for complaining of racial discrimination and retaliation.

87.     These actions as aforesaid constitute violations of 42 U.S.C. § 1981.

**COUNT III**
**Violations of the New Jersey Law Against Discrimination ("NJLAD")**
**([1] Race Discrimination; [2] Retaliation; and [3] Hostile Work Environment)**
**-Against All Defendants -**

88.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

89.     During Plaintiff's employment with Defendants, he was subjected to a hostile work environment and discrimination through disparate/derogatory treatment and discriminatory comments as outlined *supra* because of his race.

90.     Plaintiff objected to/complained of the aforementioned instances of race discrimination; however, his concerns were ignored, and instead, Plaintiff was subjected to ongoing retaliation – such that he was subjected to a retaliatory hostile work environment.

91.     On or about November 11, 2022, Plaintiff was abruptly terminated from his employment on the same day as his last complaints of racial discrimination/retaliation.

92.     Plaintiff believes and therefore avers that his race was a motivating and/or determinative factor in Defendants' decision to move him to first shift, issue him discipline, and terminate his employment.

93.     Plaintiff also believes and therefore avers that he was terminated in retaliation for complaining of racial discrimination and retaliation.

94.     These actions as aforesaid constitute violations of the NJLAD.

**Count IV**
**Violations of the Family and Medical Leave Act ("FMLA")**
**([1]Interference; and [2] Retaliation)**
**-Against All Defendants -**

95.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

96.     Plaintiff had at least 1,250 hours of service with the Defendants during his last full year of employment (pre-FMLA leave request).

97.     Defendants engaged in an industry affecting commerce and employ fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

98.     Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of FMLA.

99.     Plaintiff requested a medical leave of absence to care for his father; however, Plaintiff's rights were interfered with, and he was subjected to retaliation and terminated just eleven (11) days after requesting medical leave.

100.    Plaintiff believe and therefore avers that Defendants committed interference and retaliation violations under the FMLA by, *inter alia*: (1) terminating Plaintiff in retaliation for exercising his FMLA rights; (2) terminating Plaintiff to prevent him from taking FMLA leave in the near future; (3) considering Plaintiff's FMLA needs in making the decision to terminate him; and/or (4) subjecting Plaintiff to actions which would dissuade a reasonable person from continuing to exercise his rights under the FMLA.

101.    Plaintiff believes and therefore avers that his request for medical leave was a motivating and/or determinative factor in Defendants' decision to terminate his employment.

102.    These actions as aforesaid constitute both interference and retaliation violations of the FMLA.

**COUNT V**
**Violations of the New Jersey Family Leave Act ("NJ FLA")**
**([1] Interference; and [2] Retaliation)**
**-Against All Defendants -**

103.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

104.    Plaintiff had at least 1,000 hours of service with the Defendants during his last full year of employment (pre-NJ FLA leave request).

105.    Defendants employ 30 or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to N.J. Admin. Code § 13:14-1.2.

16

106.    Plaintiff requested a medical leave of absence to care for his father; however, Plaintiff's rights were interfered with, and he was subjected to retaliation and terminated just eleven (11) days after requesting medical leave.

107.    Plaintiff believe and therefore avers that Defendants committed interference and retaliation violations under the NJ FLA by, *inter alia*: (1) terminating Plaintiff in retaliation for exercising his NJ FLA rights; (2) terminating Plaintiff to prevent him from taking FMLA leave in the near future; (3) considering Plaintiff's NJ FLA needs in making the decision to terminate him; and/or (4) subjecting Plaintiff to actions which would dissuade a reasonable person from continuing to exercise his rights under the NJ FLA.

108.    Plaintiff believes and therefore avers that his request for medical leave was a motivating and/or determinative factor in Defendants' decision to terminate his employment.

109.    These actions as aforesaid constitute violations of the NJ FLA.

**COUNT VI**
**Violations of the New Jersey Conscientious Employee Protection Act (" CEPA")**
**(Wrongful Termination - Retaliation)**
**-Against All Defendants -**

110.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

111.    Plaintiff objected to/complained of conduct he believed to be unlawful/unsafe, including, but not limited to, Defendants' employees operating heavy machinery without certification thereof. However, his concerns were ignored, and instead, Plaintiff was subjected to retaliation and terminated the same day as his last complaints of unsafe working conditions.

112.    Plaintiff believes and therefore avers that his objections to unlawful conduct/unsafe working conditions were a motivating and/or determinative factor in Defendants' decision to terminate his employment.

17

113.    These actions as aforesaid constitute violations of the CEPA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    Defendants are to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B.    Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.    Plaintiff is to be awarded punitive and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for its willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

D.    Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E.    Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.    Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____

Ari R. Karpf, Esq.
3331 Street Rd.
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated:  July 31, 2023